UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TERRY BOGAN,                       )
                                   )
            Plaintiff,             )
                                   )  Case No. 09 C 4604
                                   )
      v.                           )  Magistrate Judge Arlander Keys
                                   )
MICHAEL ASTRUE, Commissioner       )
of Social Security,                )
                                   )
            Defendant.             )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Terry Bogan, filed an application for Disability Insurance Benefits and Supplemental Security Income on April 25, 2005, alleging that he became unable to work as of July 20, 2003, because of his asthma and his chronic obstructive pulmonary disease ("COPD"). The Social Security Administration denied his claim initially and on reconsideration, and Mr. Bogan requested a hearing before an administrative law judge. The case was assigned to ALJ Helen Cropper, who held a hearing on the matter on October 9, 2007.

At that time, the ALJ heard from Mr. Bogan and his attorney, as well as a vocational expert, Thomas Dunleavy. Initially, Mr. Bogan's attorney represented that, because Mr. Bogan had been without health insurance since 2006, he had not been treated consistently by his doctors since that time. Record at 442. And Mr. Bogan testified that, between June of 2006 and August of

2007, he sought treatment not from his regular doctors, but through visits to the emergency room. Record at 442. Mr. Bogan's attorney also represented that he last worked in April of 2003, when his severe shortness of breath forced him to stop working; prior to that, he had worked as a stocker for various employers. Record at 451.

Testimony of Plaintiff

Mr. Bogan, who was 39 years of age at the time of the hearing (DOB 1/3/68), testified that he lives with his mother and had done so for more than 11 years. Record at 452. He testified that he is single and has never been married, id., but that he has a 13 year old child. Record at 453. He testified that he relies on public aid for income and that he gets $100 in cash and $150 in Link card funds each month. Record at 453. He also testified that he had been receiving long-term disability, in the amount of $910 per month, but that his last check came in February of 2005; he testified that the provider requested additional medical records and, when he couldn't get them, they cut him off and sent him to the Social Security Administration. Record at 454.

With regard to his educational and employment history, Mr. Bogan testified that he did not finish high school, but left after the 11th grade because his family "needed more money in the house and I had to go to work." Record at 454-455. He testified

that he is able to read and write and perform simple math tasks; he testified that he has a driver's license, which was suspended at the time of the hearing because he had failed to pay a reinstatement fee after a 2005 accident. Record at 455-456. Mr. Bogan testified that he last worked in April of 2003, stocking shelves, lifting and loading inventory merchandise at Costco.[1] Record at 457. He testified that he was primarily responsible for loading very heavy merchandise, including outdoor furniture, yard swings, swimming pools and some groceries. Record at 457-458. He testified that the merchandise he stocked weighed, on average, 50 to 100 lbs., with some items weighing as much as 120 lbs. Record at 458. He testified that he sometimes used pallett jacks to help with the lifting and stocking, and he testified that the job mostly involved walking and standing. Record at 458. He testified that he had trouble doing the work because of the dust, mold and mildew in the building; he testified that he often experienced chest pains, weakness in his arms and shortness of breath, and that, because of these issues, he requested a transfer out of that building; he testified that the company then released him on long-term disability. Record at 458-459.

Mr. Bogan testified that, prior to Costco, he worked for many years (about 16) at Stony Island Food Mart, also as a

---

[1] The hearing transcript actually says "Cosec," but Mr. Bogan described the place as a Sam's Club type warehouse, and so the Court assumes "Cosec" should really read "Costco." See Record at 172.

stocker. Record at 460. He testified that, at the food mart, he unloaded trucks and stocked shelves; he testified that he had no trouble doing this job and that he left that job for Costco because the money was better. Record at 461. He testified that he also worked for a couple of summers for the Chicago White Sox, filling stands at the ballpark. Record at 461.

In response to a question from the ALJ, Mr. Bogan testified that he is no longer able to work because of "[c]hest pain, shortness of breath, a lot of wheezing." Record at 463. He testified that he previously smoked, but that he quit in mid-2006 because his doctor told him to quit. Record at 463. With regard to his medical history, Mr. Bogan testified that he had been seeing Dr. Razma, a pulmonologist, and that Dr. Razma prescribed various medications, including Advair, which worked the best for him. Record at 463-464.

Mr. Bogan testified that he was admitted to the hospital for a week in October 2006, from the 10th to the 17th; he testified that, at that time, the doctors at Oak Forest Hospital "put him on home oxygen." Record at 466-467. He testified that the home oxygen order was written on October 14, 2006, and that the doctors at the hospital would not release him until the oxygen had been delivered to his home. Record at 468. He testified that he continues to use oxygen at his home, "about 60 percent of the day time. If I'm just laying there in bed I have it on, and

4

I use it overnight." Record at 468. He testified that he carries the oxygen with him, and he had it with him at the hearing. Record at 468. He testified that he uses the oxygen when his "breathing start getting real bad or I get dizziness." Record at 469. He testified that he used the oxygen on the train, on the way to the hearing. Record at 469. He testified that the oxygen is delivered to his home regularly by Dependent Care. Record at 469. He also testified that he uses a home nebulizer about three times a day, usually in the morning, in the evening and before he goes to bed at night; he also testified that he uses an albuterol inhaler on an as needed basis, roughly four times a week. Record at 471-472. He testified that his breathing becomes labored if he climbs stairs or walks more than half a block or a block, even at a comfortable pace. Record at 472. He testified that his breathing issues "got real bad" at about the end of 2005. Record at 472.

With regard to his daily activities, Mr. Bogan testified that he usually gets up around 9:30 a.m., but that he pretty much just lies around all day. Record at 473-474. He testified that he helps his mother watch his niece and his foster brother, helps with homework and meal preparation, keeps his room neat, washes dishes and does some laundry. Record at 474. He testified that he sees his daughter and his daughter's mother occasionally and that he enjoys watching games and following sports on television.

Record at 475-476. Mr. Bogan testified that he thinks he could lift 10 to 15 lbs., maybe a bag of canned goods or a set of golf clubs; he testified that he is comfortable sitting, that he can stand briefly and can comfortably walk about a block or a block and a half. Record at 477. He is able to feed, bathe and dress himself and otherwise take care of his daily hygiene. Record at 477-478. But, he testified, his energy level is very low; he testified that he has just "slowed down a lot." Record at 479-480. He testified that he naps roughly twice a day, sleeping two or three hours at a time and then has difficulty falling asleep at night. Record at 479. He testified that he leaves the house maybe three times a week, that generally he does not leave the house and that some days does not even get out of bed. Record at 481.

He testified that, if he stands too long, he gets dizzy and loses his balance. Record at 481. He also testified that he gets frequent headaches (several times each week), but he takes acetaminophen and naprosyn for them and they go away within a few hours. Record at 482-483.

### Testimony of the Vocational Expert

After hearing from Mr. Bogan, the ALJ heard from Thomas Dunleavy, a vocational expert ("VE"). In characterizing Mr. Bogan's past relevant work, the VE observed that he had "two full-time jobs over the relevant period, and they were both stock

workers." Record at 486. The VE testified further that Mr. Bogan performed one job at the "very heavy level of exertion" and the other at the "medium to heavy level. Record at 486. And, he testified, the position was "unskilled in all cases." Record at 486.

In response to a hypothetical posed by the ALJ, the VE testified that an individual with the residual functional capacity to perform the full range of work at the light exertional level, but with Mr Bogan's limitations – i.e., who could never climb ladders, could only occasionally climb stairs and could never be exposed to extremes of temperature or humidity, respiratory irritants, unprotected heights or unguarded hazardous equipment – would not be able to perform Mr. Bogan's past relevant work. Record at 487. He testified that such an individual would, however, be able to perform other work, including certain cashier jobs, some unskilled assembler jobs, and some light level packager jobs (primarily those found in the plastics industry); the VE further testified that these positions existed in substantial numbers in the Chicago metropolitan area. Record at 487-488. When asked whether his analysis would change if the hypothetical individual were limited to work at the sedentary level, the VE testified that some of the cashier and assembler jobs would still be available at that level, as would certain other jobs, including visual inspectors/sorters, and that

those jobs also existed in substantial numbers in the Chicago area. Record at 488. The VE testified that, if the hypothetical individual required an unusually "clean" atmosphere - that is, one with no identifiable pollutants - at least 25% of the productions jobs would still be acceptable, as would about half of the cashier jobs. Record at 489.

The VE testified that, to be employable, an individual would have to be "on task" 90% of the workday and, conversely, be "off task" just 10% of the workday. Record at 490. The VE testified that, if an individual were frequently distracted by pain or fatigue or otherwise off task and not productive, he or she would, essentially, be unemployable. Record at 490. In response to questioning from Mr. Bogan's attorney, the VE testified that, if an individual were limited to occasional fine fingering and manual dexterity (that is, could perform such tasks only about a third of the workday), there would be some light level jobs still available (notably, some usher and self-service sales attendant positions), but no jobs at the sedentary level. Record at 491. Finally, the VE testified that, if Mr. Bogan required the use of portable oxygen during the workday, competitive employment would be precluded, unless an employer were willing to work out a special accommodation. Record at 493.

Medical Records

At the close of the testimony, the ALJ agreed to hold the

8

record open so that Mr. Bogan and his attorney could supplement the file and obtain additional relevant medical records. Subsequently, Mr. Bogan's attorney submitted some records, but did not submit everything referenced at the hearing. On February 27, 2008, the ALJ wrote to Mr. Bogan's attorney acknowledging receipt of certain records – notably the February 28, 2007 records documenting Mr. Bogan's treatment in the Oak Forest and Stroger Hospital emergency rooms, and the April 2007 Fantus Clinic pulmonary function test. Record at 44. But the ALJ also expressed concern that, despite two extensions of time, Mr. Bogan's attorney had failed to submit the rest of the requested post-hearing evidence, and she advised Mr. Bogan's attorney that if she failed to respond within 10 days, she would issue her decision based upon the evidence then available to her. Record at 44. No additional documents were submitted.

The record, though incomplete, did include a variety of medical records. There are records from Christ Hospital, documenting an emergency room visit on April 26, 2003 because of an injury to his left ribs that occurred on the job. *See* Record at 175–186. At that time, Mr. Bogan was diagnosed with an abdominal strain and released with prescriptions for vicodin and motrin for pain and instructions to return to the ER if his symptoms worsened, if he had difficulty breathing or if new symptoms developed. Record at 181, 183, 186.

The record shows that Mr. Bogan returned to the ER on June 20, 2003, complaining of rib pain. Record at 187. At that time, his breathing was normal and he was experiencing no respiratory distress; he reported that, since suffering an assault with a baseball bat in 2001, he has had chronic pain in his left ribs and upper abdomen, but an x-ray revealed that he had no new fractures and that the prior injuries had healed. Record at 191, 194. He was examined and released with instructions to continue vicodin as needed and to follow up with the Family Practice Clinic in Hometown. Record at 192.

The record shows that, a month later, on July 18, 2003, Mr. Bogan had another x-ray, which showed "[p]rominent bronchovascular markings" in the lung bases with "hyperinflation of the lungs," which suggested "chronic fibrotic changes." Record at 195. The technician noted at that time that a "high resolution CT scan of the chest would be helpful for further evaluation." Record at 195. A week later, on July 29, 2003, Mr. Bogan had the recommended CT scan, which revealed bronchiectasis. Record at 197.

On August 6, 2003, Mr. Bogan was back at Christ Hospital, this time in the pulmonary function lab, where he had a number of tests, including spirometry[2], lung volume and diffusion tests.

---

[2] Spirometry assesses the integrated mechanical function of the lung, chest wall, and respiratory muscles by measuring the total volume of air exhaled from a full lung (total lung capacity or TLC) to a empty lung; it is used to establish baseline lung function, evaluate

*See* Record at 199-200. The physician who interpreted the scan noted decreased DLCO,[3] suggesting mild emphysema. Record at 201. The physician also noted that the degree of decrease in DLCO was more than would be expected for the degree of COPD. *Id.* The doctor noted three other possible reasons for the decreased DLCO: anemia, early interstitial lung disease and pulmonary vascular disease. *Id.*

On August 14, 2003, Mr. Bogan returned to the ER at Christ Hospital, complaining of shortness of breath and chest pain; he was given oxygen, albuterol and motrin and referred for a cardiac stress test. Record at 202. The cardiac stress test, performed on August 16, 2003, was within normal limits, and Mr. Bogan was discharged that day with instructions to follow up at the Family Practice Center. Record at 202. It does not appear that Mr. Bogan ever followed the advice to follow up at the Family Practice Center, as there are no records from that facility.

The record also includes notes from Dr. Antanas Razma in the Pulmonary and Critical Care Clinic in Oak Lawn, Illinois. The first, dated August 28, 2003, notes Mr. Bogan's history and the fact that he had experienced shortness of breath, worsening over

---

dyspnea, detect pulmonary disease, monitor evaluate respiratory impairment, etc.

[3] DLCO stands for the diffusing capacity of the lung for carbon monoxide; the test is used to determine the extent to which oxygen passes from the air sacs of the lungs into the blood.

time, for about 2 years. After examining Mr. Bogan, Dr. Razma concluded that "the most likely diagnosis is asthma"; Dr. Razma prescribed Advair, advised Mr. Bogan to use albuterol "on a p.r.n. rescue basis or prior to strenuous exercise," and asked him to return in two weeks. Record at 271-272.

On September 11, 2003, Mr. Bogan returned to the Pulmonary Clinic. Dr. Razma's notes from that date indicate that, with the Advair, Mr. Bogan was feeling "much better." Record at 276. By this second visit, Dr. Razma had reviewed the pulmonary function tests done at Christ Hospital; he noted that they showed "mild obstruction, with hyperinflation and a decreased diffusion capacity," suggestive of either "emphysema from his previous smoking or asthma with the decreased DLCO explained by some other etiology, including anemia, pulmonary vascular disease, etc." Record at 276. Dr. Razma asked Mr. Bogan to return in two weeks, which he did. At that visit, on September 25, 2003, Dr. Razma noted that Mr. Bogan was "feeling better on the Advair 250/50, bid and the Albuterol 2 puffs bid." Record at 274. He noted that Mr. Bogan's "emphysema, which is mild, is stable and he is breathing much better on the present regimen." Record at 274. Dr. Razma ruled out anemia as a possible cause of Mr. Bogan's decreased diffusion capacity, but admitted that he was "still puzzled" as to why he has the decreased diffusion capacity." Record at 274.

With regard to any return to work, Dr. Razma noted that Mr. Bogan could not be around chemical fumes, dust or smoke and could not "do full, heavy labor." Record at 274.

Mr. Bogan next saw Dr. Razma on April 8, 2004. At that time, Dr. Razma admitted that he was "still not exactly sure of the exact diagnosis"; he stated that he was "still confused as to why he is dyspneic to this degree, especially with the markedly decreased diffusion capacity." Record at 275. Dr. Razma indicated that he would pursue some additional testing. *Id.*

Dr. Razma's notes from a follow-up appointment on December 13, 2004 reiterate that Mr. Bogan "has mild COPD . . . but the severity of his dyspnea on exertion is out of proportion to the objective manifestations of his pulmonary disease." Record at 262. Dr. Razma indicated that he "did room air rest and exercise oximetry and it showed 95% at rest, but dropped to 89% with exertion, which is significant." *Id.*

Dr. Razma next saw Mr. Bogan on January 17, 2005, though, at Dr. Razma's request, he had some additional testing done prior to that appointment. According to the physician who interpreted those pulmonary tests, they revealed "moderate chronic obstructive pulmonary disease with minimal response to brochodilators with severely reduced diffusion capacity raising the question of emphysema in a young person." Record at 251. After noting the test results, Dr. Razma advised Mr. Bogan to

13

increase his Advair to 250/50 bid to see if that would help his breathing" and explained to him "that he probably cannot do any physical activity because of the severity of his moderate COPD, but that he could do a sedentary job," though "he has to avoid smoke and other dusts or noxious odors." Record at 260. Dr. Razma noted that Mr. Bogan likely could not "do any significant physical labor without becoming very dyspneic, since there has been significant progression of disease in less than a year and a half . . . ." *Id.* Dr. Razma asked Mr. Bogan to return in three months.

It appears that Mr. Bogan did not return to Dr. Razma until October 31, 2005 – six months later than advised. According to Dr. Razma's notes from the October 31, 2005 visit, Mr. Bogan reported experiencing shortness of breath and frequent wheezing. Record at 258. According to Dr. Razma, Mr. Bogan admitted that he was still taking the albuterol, but that he had stopped using the Advair as prescribed because it was too expensive; Dr. Razma gave him a trial of both Advair and Spiriva, and instructed him to follow up in 5 to 6 weeks. He also re-emphasized to Mr. Bogan the importance of taking his medication. At that time, Dr. Razma noted that he had done "room air rest and exercise oximetry" on Mr. Bogan and "it was 95% . . . at rest and 88% with exertion, so he does not need oxygen yet." Record at 258.

Dr. Razma's final note, dated June 21, 2006, indicates that

Mr. Bogan continued to experience shortness of breath and frequent wheezing, but had "done better on Albuterol 2 puffs bid, and prn, Spiriva q day and Advair 250/50 bid." Record at 370. Dr. Razma noted that, at that time, Mr. Bogan was "not requiring oxygen, he [probably doesn't have any insurance and is trying to get disability." Record at 370. Dr. Razma was puzzled "why this patient has significant COPD with an FEV1 back in 1/3/05 of 64% of predicted with air trapping and decreased diffusion capacity, compatible with moderate COPD. There has actually been deterioration since the 8/06/03 Study. I'll continue the present medications and I gave him samples. I'll repeat an x-ray I'll hold on repeating PFT's until he has disability because of the cost, but I renewed his medications." Record at 370. Finally, Dr. Razma noted that he "did room air rest and exercise oximetry and it was 95% sat at rest, and only dropped to 88% with exertion, so he does not need oxygen yet." Record at 370.

The record does not include any further documentation from the Pulmonary Clinic. But it does include documents showing that Mr. Bogan was admitted to Oak Forest Hospital on January 2, 2007, complaining of left-sided chest pain and shortness of breath. Record at 367. He was again hospitalized on June 13, 2007. According to the records of that admission, Mr. Bogan reported that he had COPD and had been on home oxygen since October 2006, though there are no records concerning the oxygen prescription or

15

delivery. Record at 377. Mr. Bogan was given oxygen in the hospital, along with other respiratory treatments, and was discharged on June 15, 2007.

In addition to the treatment records, the record also includes an October 15, 2003 report from Dr. M.S. Patil, who examined Mr. Bogan at the request of the Bureau of Disability Determination Services. According to Dr. Patil, Mr. Bogan reported smoking a pack a day for about 16 years,[4] until he quit in July 2003. Record at 230. After examining Mr. Bogan, Dr. Patil determined that his history was "suggestive of chronic airway disease"; he uses inhalers "on a regular basis," and they help him mild to moderately." Record at 231, 232. The report makes no mention of oxygen use.

<u>The ALJ's Decision</u>

The ALJ issued her decision on March 25, 2008, finding that Mr. Bogan was not disabled within the meaning of the Social Security Act. In particular, she found that Mr. Bogan met the insured status requirements of the Social Security Act through December 31, 2007 – his date last insured; that he had not engaged in substntial gainful activity since July 20, 2003, his alleged onset date; and that he had severe impairments – namely asthma and COPD – but that his impairments (alone or combined)

---

[4] Elsewhere, Mr. Bogan reported smoking about 8 cigarettes a day for those 16 years. *See, e.g.,* Record at 260.

did not meet or equal a listed impairment. Record at 30-31. The ALJ further found that Mr. Bogan had the residual functional capacity to perform most sedentary work, that he could lift, carry, push and/or pull up to 15 lbs. occasionally, could stand and/or walk for at least two hours in a workday, and could sit throughout a workday, with typical breaks. Record at 32. The ALJ noted that Mr. Bogan should only occasionally climb ramps or stairs and that he should avoid entirely ladders, ropes and scaffolds and exposure to extremes of temperature, humidity, concentrated respiratory irritants, unprotected heights and unguarded hazardous equipment. Record at 32. Finally, she noted that "the record does not establish that claimant needs to use oxygen while performing work within his RFC, or that he would be unable to use a nebulizer machine during his lunch breaks at work," and that his symptoms would leave him off task only rarely. Record at 32. Based upon this RFC, the ALJ determined that Mr. Bogan was precluded from performing his past relevant work; she determined, however, that, considering his age, education, work experience and RFC, he could still do other jobs that existed in significant numbers in the national economy (such as some cashier jobs, some assembler jobs, and some visual inspector/sorter jobs). Record at 41-42.

Mr. Bogan appealed the ALJ's decision, and the Appeals Council denied review on October 6, 2008 and again, after

receiving additional evidence, on June 11, 2009, making the ALJ's decision the final decision of the Commissioner. Record at 3. Mr. Bogan filed this lawsuit on July 31, 2009, seeking review of that decision. The case is now before the Court on cross motions for summary judgment.

## Discussion

An individual seeking DIB must prove a disability under the SSA's five step inquiry. 20 C.F.R. § 404.1520. First, the ALJ establishes whether the individual is employed; second, the ALJ determines if the individual has a severe impairment; third, the ALJ decides if the impairment meets or medically equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ ascertains the individual's RFC and whether he can perform his past relevant work; finally, the ALJ determines whether the individual is capable of performing work in the national economy.

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). The ALJ must "build an accurate and logical bridge from the

18

evidence to her conclusion." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir. 2003)). Should conflicting evidence permit reasonable minds to differ, it is the responsibility of the ALJ – not the courts - to determine if the claimant is disabled. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990). While the ALJ need not address every piece of evidence in the record, she must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Sims v. Barnhart,* 309 F.3d 424, 429 (7th Cir. 2002). Unless the ALJ fails to rationally articulate the grounds for his decision in a manner that permits meaningful review, the Court must affirm if there is substantial evidence supporting the ALJ's decision. *Id.*

As explained, the ALJ determined that Mr. Bogan was not disabled within the meaning of the Act. Mr. Bogan argues that the ALJ's decision should be reversed or remanded for three reasons: (1) contrary to the ALJ's findings, the evidence established that Mr. Bogan must be on oxygen for 60% of the day, essentially making him unemployable; (2) the ALJ erred when she

determined that Mr. Bogan's breathing condition did not meet listing 3.02c; and (3) the ALJ failed to make a valid credibility determination.

1. The Evidence Concerning Mr. Bogan's Use of Oxygen

Mr. Bogan first challenges the ALJ's finding concerning his use of oxygen. To be sure, there is evidence in the record demonstrating that Mr. Bogan used oxygen – indeed, he had an oxygen canister with him at the time of the hearing before the ALJ, and he testified that he had used the oxygen coming in on the bus that morning. He testified that he received regular home deliveries of oxygen, and that he used it "about 60 percent of the daytime. If I'm just laying there in bed I have it on, and I use it overnight." Record at 468. He testified that he always carries oxygen with him and that he uses it "[w]hen my breathing start[s] getting real bad or I get dizziness." Record at 468–469. He testified that he receives about five canisters of oxygen, via home delivery from "Dependent Care," each month. Record at 469. When asked about the prescription, he testified that the doctor from Oak Forest Hospital was no longer prescribing home oxygen, but that "the hospital just keep me on it. When I go to the emergency room, my oxygen level real low, and just say continue using your oxygen." Record at 469.

But Mr. Bogan was unable to provide the ALJ with documentation concerning the home delivery of oxygen – even after

she held the record open to allow him to do so. In her decision, the ALJ noted that she had expected such records to be forthcoming:

> After the hearing, the record was held open for 30 days, so claimant could submit additional medical evidence, to include progress notes and computer pharmacy records from Oak Forest Hospital and treatment records from Stroger Hospital, all for the period from April, 2003 to the present, along with documentation from claimant's home oxygen provider regarding the oxygen supplied to claimant since October, 2006. After two extensions, Ms. Teare [Mr. Bogan's attorney] eventually submitted additional 2007 Oak Forest and Stoger records, but none of the older or routine outpatient treatment records, and none of the oxygen or pharmacy records. In addition, only a few pages were submitted documenting claimant's Oak Forest admission for pneumonia during October, 2006, when oxygen reportedly was first prescribed.

Record at 28.

Later, when considering Mr. Bogan's ability to perform work, the ALJ recognized that, according to the VE, most employers "would not tolerate a worker who needed to use a portable oxygen tank at the workstation." Record at 42. But she also noted that "the record available to me does not establish that claimant has been prescribed home oxygen, or that he needs to use it so frequently that he could not sustain a workday without additional oxygen supplementation." Record at 42.

Additionally, when assessing Mr. Bogan's credibility, the ALJ noted that he had failed to submit complete records from Oak Forest Hospital covering his October 2006 admission and failed to submit any records relating to a prescription for oxygen; based

upon that failure, the ALJ "infer[red] that those records would not fully support claimants testimony." Record at 40.

The record does include some reference to the home oxygen prescription; for example, an admission form from Oak Forest Hospital dated January 2, 2007 notes that "[t]he patent also is on home oxygen therapy." Record at 367. A discharge note from Stroger Hospital dated February 28, 2007 advises Mr. Bogan to "continue home oxygen as prescribed." Record at 437. Another admission form dated June 13, 2007 notes that Mr. Bogan has been "on home oxygen since October 2006." Record at 377. An emergency department record from that same date notes that Mr. Bogan was, at the time, "on home oxygen" for his COPD. Record at 407. And, while admitted in June 2007, Mr. Bogan was administered oxygen, as well as other respiratory treatments (albuterol, beclomethasone or Qvar) throughout the day. *See* Record at 391–402.

Notes from Dr. Antanas Razma in the Pulmonary Clinic dated October 31, 2005 and June 21, 2006 show that Mr. Bogan had respiratory difficulties, but did not yet require oxygen. Record at 370-371. But these are not inconsistent with the records described above, coming as they do before he allegedly started home oxygen therapy. But whether or not the prescription is documented, it is undisputed that, two months before the hearing, Mr. Bogan was in the hospital, where he received oxygen

22

consistently and other respiratory treatments regularly. He carried an oxygen canister with him to the hearing and used it. And there is nothing to suggest that he was faking; there is no reason to doubt the notion that he had been prescribed oxygen for home use. The extent to which he claimed he required oxygen – 60% of the day – is another story.

Case law makes clear that an ALJ may not draw negative inferences from the claimant's failure to seek treatment or to follow prescribed treatment without first examining the reasons for such failure. That is not really the issue here – although it is true that Mr. Bogan failed to follow the medical advice he received and that he was less than compliant with his prescriptions, the record shows that he may have done so – at least some of the time – because of a lack of insurance, an arguably valid reason. But the ALJ does not seem to have faulted Mr. Bogan for failing to take medications and fulfill prescriptions. Rather, the ALJ faulted Mr. Bogan for failing to offer documentation to support his home oxygen regimen; and there is no contention that his failure to provide the substantiating documents had anything to do with an inability to pay.

To be sure, "[a]n ALJ has a duty to fully develop the record before drawing any conclusions" about the evidence or lack thereof. *E.g., Bryan v. Astrue*, No. 08 C 5472, 2009 WL 2477542, at *8 (N.D. Ill. Aug. 13, 2009)(citing *Murphy v. Astrue,* 496 F.3d

630, 634 (7th Cir. 2007)). But here, the ALJ tried to do just that – she probed Mr. Bogan on the issue of his oxygen use and then held the record open to give him time to document that use. He chose not to provide any records or documentation; nor did he offer any reason or excuse for not doing so. Given that Mr. Bogan has been represented by counsel throughout these proceedings, it was not inappropriate for the ALJ to draw a negative inference from his failure to provide records concerning the home oxygen use; certainly, the ALJ was entitled to assume that he was making the strongest case possible for benefits, and that the records would have undermined that goal. *See, e.g., Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391(7th Cir. 1987)("When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits.").

In short, if this case turned on Mr. Bogan having to prove that he required oxygen 60% of the day, he would lose. As explained above, Mr. Bogan has not met his burden of showing that he required oxygen to the extent claimed. But fortunately for Mr. Bogan, this case does not turn on the extent of his home oxygen use.

Significantly, although the ALJ was entitled to assume that Mr. Bogan did not require oxygen to the extent he claimed, based

on the record before her, she could not reasonably conclude that Mr. Bogan required no oxygen. Although he never produced a prescription, Mr. Bogan carried an oxygen canister with him to the hearing, and he testified that he had used it that morning. Moreover, every doctor who treated him acknowledged and accepted that he required the use of oxygen at home. This is significant because, as Mr. Bogan pointed out in his reply brief, the VE testified that *any* use of oxygen rendered Mr. Bogan unemployable. The VE testified that, if Mr. Bogan required the use of portable oxygen during the workday, competitive employment would be precluded, unless an employer were willing to work out a special accommodation. Record at 493. He left open the possibility that an employer might make an accommodation for the occasional or sporadic use of oxygen on the job. But the record was not sufficiently developed to allow the ALJ – or the Court – to make any findings concerning whether positions provided by such employers exist in significant numbers in the regional economy. Accordingly, the Court is compelled to remand the matter to the Commissioner.

2. Analysis of Listing 3.02

Somewhat relatedly, Mr. Bogan argues that his breathing condition met or equaled a listed impairment – namely, 3.02c. The ALJ considered both the COPD listing and the asthma listing:

> The listing that applies to COPD [is] Listing 3.02. To meet the listing, the objective medical evidence must

25

> document the severity of the impairment, despite
> treatment, either by pulmonary function test (PFT)
> results that show marked impairment of lung function,
> or by similar marked and persistent abnormality of DLCO
> or arterial blood gas studies (ABG).
>
> Listing 3.03 applies to asthma. To meet the listing,
> the objective medical evidence must document the
> severity of the impairment either by PFT results
> (measured by the same standard used for COPD), or by
> frequent documented attacks which require emergency
> medical intervention.

Record at 31. She concluded, however, that the evidence did not

establish the level of severity required under either listing.

In particular, the ALJ concluded that, although Mr. Bogan had

several PFTs during the relevant time,

> none of the results showed listing-level abnormalities
> of claimant's one second forced expiratory volume
> (FEV1) or forced vital capacity (FVC), for a person of
> claimant's height of 69 inches. Almost all the PFT
> results significantly exceeded the COPD listing level
> for 3.02A or the asthma listing for 3.03A.

Record at 31. The ALJ further noted that, although Mr. Bogan had

had two ABG tests during the relevant time period, "those tests

apparently were administered when claimant was not in a

clinically stable condition; instead, the first test was done

while he had pneumonia, and the second not long after a reported

exacerbation of symptoms." Record at 31-32. Despite this, the

ALJ noted, "the second test showed results better than listing

level." Record at 32.

The ALJ also noted that, although Mr. Bogan had had

"markedly abnormal" results on testing for diffusing capacity of

the lungs for carbon monoxide (DLCO), his results "apparently did not satisfy the regulatory standards, which require that the single breath DLCO is either less than 10.5 mL/minute or less than 40% of the predicted normal value. Record at 32. Thus, in the ALJ's view, neither the COPD nor the asthma listing was satisfied.

Listing 3.02, for impairments involving chronic pulmonary insufficiency, explains that an individual's impairment is of listing-level severity if the individual has "[c]hronic obstructive pulmonary disease due to any cause, with the $FEV_1$ equal to or less than the values specified in table I corresponding to the person's height without shoes." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.02. The required $FEV_1$ level corresponding to Mr. Bogan's height of 71 inches was 1.55.[5] *Id.* Mr. Bogan's testing in August of 2003 demonstrated $FEV_1$ of 2.88 before the administration of medication and 3.03 after the administration of medication, Record at 199; his testing in October 2003 demonstrated $FEV_1$ of 2.80, 2.86 and 3.03 in three trials before medication, Record at 233; his testing in January 2005 demonstrated $FEV_1$ of 2.41 before medication and 2.56 after medication, Record at 333; and his testing on May 9, 2007 demonstrated $FEV_1$ of 2.47 before medication and 2.70 after

---

[5] For some of the tests, Mr. Bogan's height was measured at 68 inches, see, e.g., Record at 233. But the Court will use the taller measurement, as that works to his advantage on Table 1.

medication, Record at 430. Because none of these values were equal to or less than the value specified (1.55), the ALJ correctly determined that Mr. Bogan's COPD did not meet listing 3.02.

Listing 3.02 also explains that an individual's impairment is of listing-level severity if the individual has "[c]hronic impairment of gas exchange due to clinically documented pulmonary disease" with "[s]ingle breath DLCO (see 3.00F1) less than 10.5 ml/min/mm Hg or less than 40 percent of the predicted normal value. (Predicted values must either be based on data obtained at the test site or published values from a laboratory using the same technique as the test site." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.02.

The record shows that Mr. Bogan satisfied the listing requirements for DLCO on more than one occasion: testing done August 6, 2003 demonstrated DLCO of 10.46 and 30% of the predicted normal value, Record at 199; testing done January 3, 2005 demonstrated DLCO of 7.95, Record at 333; and testing done May 9, 2007 demonstrated DLCO of 10.2 and 27% of predicted normal value. Record at 430. The ALJ recognized that Mr. Bogan's DLCO test results were "markedly abnormal." Record at 32. But she determined that the results in the file "apparently do not satisfy the regulatory standards" because "only one test was administered on each of the testing, instead of the two tests,

within a short time, that would document consistent results."
Record at 32. The ALJ also noted that, for the January 2005
test, Mr. Bogan's "hemoglobin result apparently was not available
to the tester . . . and it is not clear whether the results were
adjusted after the other tests for any abnormalities in [his] lab
work." *Id.* She also noted that, according to Dr. Razma, the
August 2003 DLCO result "was significant [sic] lower than would
be expected by the other clinical evidence showing the degree of
emphysema or COPD." *Id.* Accordingly, the ALJ concluded that
"the available objective medical evidence does not establish that
claimant has met his burden of proving that he suffers or
previously suffered from listing-level COPD." *Id.*

It is true, as the ALJ noted, that the regulations provide
specifics concerning how the DLCO testing should be accomplished;
in particular, the regulations provide that

> [t]he DLCO should be measured by the single breath
> technique with the individual relaxed and seated . . .
> . A DLCO should be reported in units of ml CO,
> standard temperature, pressure, dry (STPD)/min/mm Hg
> uncorrected for hemoglobin concentration and be based
> on a single-breath alveolar volume determination.
> Abnormal hemoglobin or hematocrit values, and/or
> carboxyhemoglobin levels should be reported along with
> diffusing capacity.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.02.
Additionally,

> [t]he DLCO value used for adjudication should represent
> the mean of at least two acceptable measurements, as
> defined above. In addition, two acceptable tests
> should be within 10 percent of each other or 3 ml

CO(STPD)/min/mm Hg, whichever is larger.  The percent
difference should be calculated as 100x(test 1 - test
2)/average DLCO.

*Id.*  It is troubling, however, that the ALJ's findings on this

issue were less than unequivocal; in dismissing the results, she

stated that the results "apparently do not satisfy the regulatory

standards."  Record at 32.  Given the results, she should know

for certain whether the tests satisfy the criteria in the

regulations.

Also troubling is the significance ascribed by the ALJ to

Dr. Razma's assessment of the DLCO results.  In dismissing the

DLCO results, the ALJ noted that Dr. Razma, Mr Bogan's treating

pulmonologist, found his August 2003 DLCO result to be

"significant[ly] lower than would he expected by the other

clinical evidence showing the degree of emphysema or COPD."

Record at 32.  Read in the context of Dr. Razma's other notes,

which show that he was puzzled by the extent of Mr. Bogan's

pulmonary distress, given his age and relatively light smoking

history, this remark suggests that, if anything, the extent of

Mr. Bogan's impairment should be further explored, not dismissed

out of hand.  And, on remand, the ALJ should determine,

concretely, whether Mr. Bogan meets or equals the listing

criteria concerning DLCO studies; she should also determine, once

and for all, whether Mr. Bogan's condition would have

necessitated, as of his date last insured, the use of portable

oxygen on the job.

3.  The ALJ's Credibility Determination

Finally, Mr. Bogan challenges the ALJ's credibility determinations, arguing that they fail to satisfy the requirements of SSR 96-7p. An ALJ's credibility assessment is "afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). An ALJ must weigh all credible evidence, but the law "does not compel an ALJ to accept wholly the claimant's perception of a disability." *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). The ALJ's determination will not be reversed "unless it is patently wrong." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). The Court does not review the medical evidence *de novo*, and will only declare the ALJ's determination patently wrong if it "lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). Social Security Ruling 96-7p requires a credibility decision to "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (explaining that "a single, conclusory statement that 'the individual's

31

allegations have been considered' or that 'the allegations are (or are not) credible'" is insufficient).

Here, the ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the RFC assessment . . . ." Record at 39. To support her credibility determination, the ALJ first noted that Mr. Bogan "apparently has failed to establish a relationship with a primary physician, despite numerous referrals and recommendations that he do so." Record at 39. Although Mr. Bogan cited his lack of health insurance as an excuse for failing to obtain treatment or recommended prescriptions, he failed to establish routine care even when he did have insurance. Record at 39-40. Additionally, although Mr. Bogan told the ALJ that he suffered from frequent profound fatigue, extreme dizziness and other difficulties, he did not report such limitations to his treating or examining physicians. He did complain to his doctors about shortness of breath, but, by his own admission, that occurred with exertion and allowed him to do the lifting, standing and walking required of sedentary work. Record at 40. The ALJ also found notable Mr. Bogan's failure to submit the rest of the Oak Forest records, including the records of the October,

2006 admission, and a prescription and oxygen records." Record at 40. "In sum," the ALJ concluded, "the above RFC assessment is supported by the objective medical evidence, and by claimant's contemporaneous reports to his treating physicians. Claimant's testimony about much more significant limitations is not well-supported in the record." Record at 40.

Mr. Bogan argues that the ALJ merely made a conclusory statement about his credibility, but failed to support it with specific reasons. But that is simply not true. The ALJ gave three specific reasons for discounting Mr. Bogan's credibility, and those reasons are supported in the record. Accordingly, this Court will not second guess the ALJ's credibility determination, and will not remand on this basis.

## CONCLUSION

For the reasons set forth above, the Court grants Mr. Bogan's Motion for Summary Judgment [#24] and denies the Commissioners Motion for Summary Judgment [#32]. The case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: December 20, 2010

E N T E R E D:

_Arlander Keys_
_____
MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT